IN THE UNITED STATES DISCTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KAITLYN KILLGO | ) | |
|     Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| THE WASHINGTON UNIVERSITY | ) | |
| d/b/a WASHINGTON UNIVERSITY, | ) | |
| | ) | |
| WASHINGTON UNIVERSITY | ) | |
| DETECTIVE JEFFREY BARNHOUSE, | ) | |
| | ) | |
| ST. LOUIS COUNTY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| EUREKA POLICE OFFICER | ) | |
| TORRE KUELKER, | ) | |
|     Defendants. | ) | |

## COMPLAINT

1.     In April of 2024, Washington University—a private institution—put out an order for the arrest of Kaitlyn Killgo, a United States citizen and resident of Missouri. Washington University is the only private university in Missouri to have its own police force independent from the police of the county in which it is located. Washington University police officers ordered Ms. Killgo's arrest through the unconstitutional use of what is known as a "Wanted for Questioning" (hereinafter, a "Wanted") despite the complete lack of exigent circumstances or need. In September of 2024, Eureka City police officers arrested Ms. Killgo pursuant to the Wanted issued by Washington University Police Department ("WUPD"). Ms. Killgo was released after being held for hours on end solely because she did not want to answer questions, which is within her constitutional rights under the Fourth and Fifth Amendments to the United

States Constitution. Because of her refusal, Detective Barnhouse of WUPD retaliated against Ms. Killgo by threatening to have her arrested again if she did not go to WUPD for questioning. WUPD officers further retaliated against Ms. Killgo by unlawfully harassing and intimidating her while she engaged in activity protected by the First Amendment.

**PARTIES**

2.      Plaintiff Kaitlyn Killgo is a citizen of the United States of America and a resident of St. Louis City, Missouri.

3.      Defendant Officer Torre Kuelker is a sworn peace officer employed by the Eureka Police Department. All of Defendant Kuelker's actions set forth in this Complaint were done under color of Missouri law. Defendant Kuelker is sued in his individual capacity.

4.      Defendant Detective Barnhouse is an employee of Washington University deputized under St. Louis County Revised Ordinance 701.070.10 and serving on WUPD. All of Defendant Barnhouse's actions set forth in this complaint were done under color of Missouri law. Defendant Barnhouse is sued in his individual capacity.

5.      Defendant The Washington University d/b/a Washington University is a business entity that resides and does business primarily in the state of Missouri.

6.      Defendant St. Louis County, Missouri, is a political and geographic subdivision of the State of Missouri existing pursuant to Missouri law.

**JURISDICTION AND VENUE**

7.      This case is brought pursuant to 42 U.S.C. § 1983. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343.

8.      The incidents giving rise to this suit occurred in the Eastern Division of the Eastern District of Missouri.

9.      Each Defendant named in this suit resides or is located in the Eastern Division of the Eastern District of Missouri

10.      As such, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

***Historical Background of Washington University's Police Department***

11.      Washington University is a business entity that owns and operates a private university.

12.      No other private university in the State of Missouri has its own police department distinct from the police department of the county in which it is located.

13.      Other private universities have routinely advocated for the Private College Campus Protection Act in hopes it would establish the statutory authority needed for private universities to employ their own police. But, this bill has not gained any traction among Missouri legislators. *See* Missouri SB 1047 (2018).

14.      Washington University is unique in asserting that members of the Washington University Police Department constitute commissioned St. Louis County police officers.

15.      Washington University has based this assertion on a 1969 ordinance passed in response to Vietnam War Protests.

16.      The Ordinance reads: "The Superintendent [of Police] . . . shall have the power to: . . . Deputize employees of a school, college, or other institution of higher learning under standards, conditions, regulation, and upon such terms as the Board [of Police Commissioners] may approve." St. Louis County Ordinance 701.070.10.

17.     This ordinance conflicts with the St. Louis County Charter, which allows only members of municipal police departments to be deputized. Section 4.275.2, St. Louis County Charter.

18.     The St. Louis County Board of Police Commissioners has nevertheless set out a "deputation agreement" with Washington University Police Department.

19.     This deputation agreement states that WUPD officers are "To attend to all matters of internal administration and control within their own department subject only to the governing body of Washington University and ongoing operational review by the St. Louis County Police Department."

20.     This deputation agreement also states the duties of WUPD are limited as such:

a.  "To attend to all matters related to minor crimes against persons and all crimes against property."
b.  "To notify the St. Louis County Police Department's Bureau of Communications in all cases wherein a serious crime against a person has occurred. If the serious crime against a person occurs in a municipality, the deputized member shall seek assistance from the appropriate municipal police department."
c.  "To report all infractions of the St. Louis County Police Department's rules and regulations, St. Louis County Ordinances and State laws where applicable, to appropriate authority and to protect all persons, university property, and equipment."

21.     Washington University routinely takes the position that its WUPD employees are not law enforcement officers.

22.     In fact, in a recent decision by the Missouri Court of Appeals where a WUPD officer attempted to assert rights under the Law Enforcement Officers Bill of Rights, Washington University successfully argued that it is a private entity and does not employ "law enforcement officers." *Wayne v. Washington University*, ED113127, 2025 WL 1932633.

23.     Indeed, Washington University refused to fulfil Ms. Killgo's public records request for documentation of the events described herein for similar reasons.

24.     Washington University attempted to justify its refusal to provide records by stating:

> The request for records under the Sunshine Law is being denied, as the University is a private institution that is not subject to the Sunshine Law. The University is not a public governmental body or a quasi-public governmental body. The officers of the Washington University Police Department are private employees, and they are not public servants employed by the state government, any county or a municipality. [1]

25.     As such, WUPD officers are employees of a private company, as Washington University has previously claimed. In the alternative, WUPD officers are St. Louis County Police Department officers.

26.     Despite WUPD's supposed link to the St. Louis County Police Department, on information and belief, WUPD officers operates independently from any meaningful oversight or supervision of the St. Louis County Police.

**The "Wanteds System"**

27.     Under current practice and custom, Washington University Police Department officers are able to utilize the REJIS "Wanteds System"

28.     Under the Wanteds System, individual police officers in the St. Louis region, including WUPD officers, can unilaterally issue statewide arrest orders to all other police departments without first obtaining a warrant by issuing a "Wanted for Questioning" on a person through REJIS.

29.     Wanteds are allegedly supported by an individual police officer's determination of probable cause. But, Wanteds do not require approval from a neutral and detached magistrate before they become effective.

---

[1] Washington University's counsel was cc'd on the email and did not correct this statement.

30.     The Wanteds system allows for any officer with access to REJIS to access an arrest order for an individuals which, unlike a warrant, lacks a judicial determination of probable cause.

31.     Effectively, the Wanteds System enables any officer in the state to arrest the target of a Wanted, even if the arresting officer has zero knowledge about the alleged underlying offense.

32.     Arresting officers routinely fail to generate their own independent probable cause before arresting the target of a Wanted.

***Ms. Killgo's Interactions with WUPD and the Wanteds System.***

33.     On April 27, 2024, Kaitlyn Killgo (hereinafter referred to as Ms. Killgo) was attending a peaceful anti-war protest located on the campus of Washington University.

34.     At no point during or after this protest did Ms. Killgo have possession of any WUPD property or property of any other police department.

35.     At no point during or after this protest did Ms. Killgo take any property of WUPD or any other police department.

36.     At no point during or after this protest was Ms. Killgo aware of anyone taking any property of WUPD or any other police department.

37.     WUPD eventually arrested Ms. Killgo on campus for her protest-related activities.

38.     After she was arrested, Ms. Killgo was taken into custody and brought to St. Louis County Jail.

39.     All of her personal property was seized by the jail and then returned when she was released.

40.     Because of this, WUPD had a record of all property in Ms. Killgo's possession that evening, which notably did not include any helmet or police equipment.

41.     Ms. Killgo was released later that night.

42.     On August 12, 2024, Ms. Killgo was participating in another protest located outside the St. Louis County Jail.

43.     An unmarked black suburban vehicle approached the area where Ms. Killgo was standing alongside a group of other protesters.

44.     Two men within the vehicle, began shouting "Killgo!"

45.     Not recognizing the vehicle or the voices, Ms. Killgo did not respond, but the unknown men continued shouting "Kaitlyn!" and "Killgo!" repeatedly.

46.     Ms. Killgo was frightened by the shouts, but was able to see into the vehicle through its rolled-down window.

47.     Ms. Killgo then realized that she recognized one of the men in the vehicle as a WUPD officer she had interacted with during her April arrest—either Detective Barnhouse or Marc Wasem.

48.     The men then shouted, "We want our helmet back!"

49.     Ms. Killgo did not know why the officers were shouting at her, and therefore did not approach them. The officers eventually drove away.

50.     Some weeks later on Labor Day Weekend of 2024, Ms. Killgo and a friend were celebrating the holiday with a day trip to a nature reserve.

51.     On her way to the reserve, Ms. Killgo drove through the City of Eureka, Missouri with a friend.

52.     While stopped at a light, she noticed a police car lingering behind her vehicle.

53.     The officer, Defendant Kuelker, turned on his lights and siren, and Ms. Killgo immediately pulled her vehicle over.

54.     Defendant Kuelker approached Ms. Killgo's vehicle and began talking to her through the passenger side window.

55.     Defendant Kuelker initially told Ms. Killgo that he had pulled her over due to her license plate being displayed in the rear window and requested that both she and her passenger provide him with identification.

56.     When Ms. Killgo's friend refused to provide his ID, Defendant Kuelker revealed that there was a Wanted on Ms. Killgo's vehicle that necessitated him identifying everyone in the car.

57.     Ms. Killgo's friend then complied, and Defendant Kuelker took both Ms. Killgo's ID and her friend's IDs to his car.

58.     After approximately thirty minutes, Defendant Kuelker returned to Ms. Killgo's vehicle and told her WUPD officers wanted to speak with her.

59.     Ms. Killgo asked Defendant Kuelker if she was being detained, and he said yes. He explained that she was being detained pursuant to a Wanted issued by WUPD officers.

60.     Ms. Killgo was then placed in handcuffs and was taken to the Eureka Police Department for processing.

61.     Defendant Kuelker told Ms. Killgo that she would be kept in custody until WUPD came to interview her.

62.     Ms. Killgo immediately expressed that she was unwilling to answer any questions.

63.     Ms. Killgo was then kept in custody.

64. Ms. Killgo was able to contact a volunteer attorney who spoke to both WUPD and Eureka police officers on her behalf.

65. From these discussions, the volunteer attorney learned that Detective Jeffrey Barnhouse had put out a Wanted identifying Ms. Killgo and/or her car.

66. The reason for this Wanted was to have Ms. Killgo in custody to attempt to interrogate her. Eureka officers arrested Ms. Killgo pursuant to this Wanted. Ms. Killgo was being held until she would make a statement to the officer.

67. The volunteer attorney made it clear to both WUPD and Eureka that Ms. Killgo did not want to be questioned without her attorney present.

68. Ms. Killgo was released after approximately four hours of being detained, and only after the voluntary attorney represented that Ms. Killgo, through counsel, would come in for an interview.

69. After the arrest, Ms. Killgo retained ArchCity Defenders ("ACD") to investigate the circumstances of her arrest.

70. Ms. Hanlon called Detective Barnhouse on September 5, 2024 to discuss the arrest of Ms. Killgo and the relevant Wanted.

71. On the call, Detective Barnhouse asked if Ms. Killgo would come into the WUPD office to make a voluntary statement.

72. When Ms. Hanlon asked Detective Barnhouse if the subject of the statement was urgent, Detective Barnhouse said it was not.

73. Ms. Hanlon said that Ms. Killgo was not willing to make a statement and would not come in for an interview.

74. The phone call ended shortly thereafter.

75.     Ms. Hanlon and Ms. Killgo called Detective Barnhouse again on September 9, 2024, to gain more clarity regarding the Wanted.

76.     Ms. Hanlon again informed Detective Barnhouse that Ms. Killgo was not willing to go into the WUPD office to make a voluntary statement.

77.     Detective Barnhouse stated that Ms. Killgo "had to" come into the station to sign a document saying she was declining to make a statement.

78.     Ms. Hanlon stated that Ms. Killgo had not only said on multiple occasions she was unwilling to make a statement, but also, Ms. Killgo was practically unable to return to Washington University's campus because Washington University had sought No-Trespass Orders against everyone who attended the anti-war protest.

79.     Detective Barnhouse responded by saying if Ms. Killgo "wasn't going to come in [he] would put out the Wanted again."

80.     Mr. Hanlon then asked Detective Barnhouse to confirm if he was threatening Ms. Killgo with an arrest order because she was unwilling to make a statement.

81.     In response, Detective Barnhouse told Ms. Hanlon to talk to his supervisor.

82.     Detective Barnhouse's supervisor, Detective Marc Wasem, then got on the phone and told Ms. Hanlon that they would either put out another Wanted or seek an arrest warrant Ms. Killgo did not come in and talk to them, or if she would not turn in "the property."

83.     This was the first time that any officer of WUPD had referenced the alleged reason for targeting Ms. Killgo.

84.     After confusion from Ms. Killgo, Detective Wasem told her a WUPD riot helmet had been stolen during the protest.

85.     This was the first time Ms. Killgo was made aware that any WUPD property was stolen.

86.     Ms. Killgo had no knowledge of the riot helmet theft and was not involved with the incident.

87.     Detective Wasem then said, "I'm telling you more than I should," and told Ms. Hanlon that he would be "seeking an arrest warrant soon." The call ended shortly afterwards.

88.     At the time of filing this complaint, Ms. Killgo does not know if there is an active Wanted out for her arrest, because there is no publicly available way for her or any other citizen to ascertain if a Wanted has been issued.

89.     Ms. Killgo has experienced distress due to the arrest and the imminent threat of future arrest at any time.

90.     WUPD has refused to cooperate any further with Ms. Killgo related to this matter.

91.     As explained above, Ms. Killgo submitted a Sunshine Request to receive information about her arrest and the WUPD policies and procedures that authorized that arrest.

92.     Ms. Killgo has been denied any records based on Washington University's contention they are not subject to the Sunshine Law and that WUPD officers are private employees as opposed to public servants.

93.     This has put Ms. Killgo in the bizarre situation where a private corporation claims the ability to order her arrest at any time by any officer in Missouri but disclaims any duty to follow the other duties of law enforcement, including compliance with the Missouri Sunshine Law.

94.     Ms. Killgo has experienced emotional distress, fear, anxiety, and apprehension from the threatened arrest and unclear status of wanted. She has avoided going out to social events or other opportunities because of her fear of being arrested by law enforcement agencies.

### The Constitutionality of the Wanteds System.

95.     The Eighth Circuit addressed the constitutionality of the Wanteds System in *Furlow v. Belmar*, 52 F.4th 393 (8th Cir. 2022).

96.     The Eighth Circuit found that "one officer's determination of probable cause" when placing a Wanted is not sufficient to "make a warrantless arrest by any law enforcement officer consistent with the Constitution." *Id*. at 401.

97.     The Eighth Circuit thus held that because "Wanteds are not warrants or supported by judicial process[,]" they "must fall within an exception to the warrant requirement in order to survive scrutiny under the Constitution." *Id*.

98.     The Eighth Circuit further implied that the manner in which St. Louis County typically applies the Wanteds System is unconstitutional, stating:

> The evidence establishes that seizures pursuant to Wanteds occur following routine traffic stops conducted by officers who, by chance, search the Wanteds database (as demonstrated by Furlow) and when an officer happens to check for Wanteds in the area (as seems to be the case in Torres' seizure). Because the Wanteds System routinely imputes a single officer's finding of probable cause to officers potentially anywhere in the country—without any showing of a joint investigation—this Wanteds System cannot be saved under the collective knowledge doctrine.

*Id.* at 402.

99.     Ms. Killgo was pulled over and arrested pursuant to a Wanted under these exact circumstances, thus her arrest and the Wanteds System as applied to Ms. Killgo is unconstitutional.

### CAUSES OF ACTION

## COUNT I
## UNLAWFUL SEIZURE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDEMENTS – COGNIZABLE UNDER 42 U.S.C. § 1983
### (Against Defendants Officer Kuelker, Detective Barnhouse)

100.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

101.    "Being taken into custody for questioning or formally arrested is a 'seizure' under the Fourth Amendment." *Furlow* 52 F.4th at 401. "Subject to narrow exceptions, seizures are generally 'reasonable' only if based on probable cause to believe that the individual has committed a crime." *Id.*

102.    Under the Wanteds System, Missouri officers routinely arrest people without first obtaining a warrant, effectively circumventing judicial review.

103.    An arrest on a Wanted is *only* constitutional if the arresting officer generated probable cause to believe the individual had committed a crime *and* the arrest falls under an existing exception to the warrant requirement.

104.    Detective Barnhouse or another WUPD officer failed to obtain a warrant for the September 2024 arrest of Ms. Killgo supported by a judicial determination of probable cause.

105.    Instead, in April of 2024 Detective Barnhouse issued a Wanted on Ms. Killgo and/or her vehicle in furtherance of his duties as a Washington University employee.

106.    The stated purpose of the Wanted was to have Ms. Killgo in custody to interrogate or question her.

107.    The incident underlying the Wanted was the alleged theft of a single piece of police equipment.

108.    WUPD also had Ms. Killgo in custody the night the helmet was stolen and thus were aware that she did not have the helmet the night it went missing.

109.    Detective Barnhouse himself admitted that the subject of the Wanted did not concern exigent circumstances.

110.    Aside from shouting at her out of vehicles, Detective Barnhouse and other WUPD officers took no steps to locate Ms. Killgo and attempt to interview her.

111.    Instead, Detective Barnhouse issued an order to all police officers who can access REJIS to arrest Ms. Killgo.

112.    Detective Barnhouse was acting in the course and scope of his employment as an agent of Washington University when he initiated this unconstitutional arrest.

113.    Eureka police officer Kuelker arrested Ms. Killgo on September 1, 2024, pursuant to the Wanted issued by WUPD.

114.    Defendant Kuelker had information about Ms. Killgo outside of the REJIS entry.

115.    "The Supreme Court has interpreted the Constitution to permit reasonable seizures of persons under two general circumstances: (1) when the arrest is effectuated pursuant to a judicially authorized arrest warrant supported by probable cause, or (2) a warrantless arrest based on the officer's determination of probable cause." *Id*.

116.    Officer Kuelker did not arrest Ms. Killgo pursuant to a judicially authorized warrant.

117.    Officer Kuelker was not operating as part of a search team with WUPD when he pulled over Ms. Killgo and effectuated her arrest.

118.    Officer Kuelker arrested Ms. Killgo pursuant to the Wanted alone without making an independent determination of probable cause and outside any viable exception to the general warrant requirement.

119.    Therefore, Detective Barnhouse initiated and Officer Kuelker effectuated an unconstitutional warrantless arrest of Ms. Killgo, violating her Fourth and Fourteenth Amendment rights under the Constitution.

120.    As a direct and proximate result of Detective Barnhouse and Officer Kuelker's conduct, Ms. Killgo has suffered injuries and damages including but not limited to: being unlawfully seized and deprived of her freedom, being detained in custody, fear, apprehension, depression, anxiety, consternation and emotional distress; and violation of her constitutional rights.

121.    The actions of Detective Barnhouse and Officer Kuelker described herein were intentional, wanton, malicious, and/or were callously indifferent to the rights of Ms. Killgo, thus entitling her to an award of punitive damages against Officer Kuelker.

122.    If Ms. Killgo prevails, she is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988

**WHEREFORE,** Ms. Killgo respectfully requests this Court issue a judgment against Defendant Officer Kuelker and Detective Barnhouse for violating her Fourth and Fourteenth Amendment rights by effecting a warrantless arrest against her unsupported by probable cause and outside any exception to the warrant requirement. Ms. Killgo further requests the judgement compensate her for the damages she suffered as a result of the unconstitutional arrest, and for any other relief this Court deems just and proper.

### COUNT II
**FIRST AMENDMENT RETALIATION AGAINST PLAINTIFF FOR EXERCISING HER FIFTH AND FOURTH AMENDMENT RIGHTS – COGNIZABLE UNDER 42 U.S.C. § 1983**
**(Against Defendants Detective Barnhouse)**

123.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

124.    When Ms. Killgo was detained by Eureka police, she immediately exercised her Fifth Amendment right to counsel by refusing to submit to a custodial interrogation by WUPD officers without her attorney present. *Edwards v. Arizona*, 451 U.S. 477 (1981); *Davis v. United States,* 512 U.S. 452 (1994).

125.    Ms. Killgo was detained and only released from Eureka Police Department's custody after her previous attorney stated he would ask her to come in for questioning.

126.    The clear implication is that Ms. Killgo was held in custody for multiple hours only because she was unwilling to make a voluntary statement.

127.    This constitutes an adverse action taken only because of Ms. Killgo's exercise of constitutionally protected speech by invoking her fifth amendment rights.

128.    After Ms. Killgo was released from Eureka Police Department's custody, she invoked her Fourth Amendment right to "walk away from questioning" by refusing to go to WUPD's station to make a voluntary statement. *See Florida v. Royer*, 460 U.S. 491 (1983).

129.    Detective Barnhouse then threatened to have Ms. Killgo arrested, either pursuant to another Wanted or a warrant, for refusing to make a voluntary statement at WUPD's station.

130.    The intended effect of Detective Barnhouse's threat was to discourage or punish Ms. Killgo for her constitutionally protected speech invoking her Fourth and Fifth Amendment rights.

131.    Detective Barnhouse's threat to arrest Ms. Killgo if she did not present to the WUPD station for questioning would chill a person of ordinary firmness from asserting their Fourth and/or Fifth Amendment rights.

132.     At all times relevant to the allegations of this complaint, Detective Barnhouse held himself out as a detective and peace officer of the State of Missouri. Thus, Detective Barnhouse's actions were conducted under color of law.

133.     As a direct and proximate result of the conduct of Detective Barnhouse, Ms. Killgo has suffered injuries and damages including but not limited to: fear, apprehension, depression, anxiety, consternation, and emotional distress; and violation of her constitutional rights.

134.     The acts of Detective Barnhouse described herein were intentional, wanton, malicious, and/or were callously indifferent to the rights of Plaintiff, thus entitling Plaintiff to an award of punitive damages against Detective Barnhouse.

135.     If Plaintiff prevails she is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**WHEREFORE,** Ms. Killgo respectfully requests this Court issue a judgment against Detective Barnhouse for violating her First Amendment rights by holding her in jail and threatening to have her arrested for constitutionally protected speech. Ms. Killgo further requests the judgment compensate her for the damages she suffered as a result of the unconstitutional and unlawful retaliation, and for any other relief this Court deems just and proper.

### <u>COUNT III</u>
### FALSE ARREST - COGNIZABLE UNDER MISSOURI COMMON LAW
### (Against Detective Barnhouse and Washington University)

136.     Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

137.     Detective Barnhouse issued a Wanted on Ms. Killgo and/or her vehicle in the days after the April 27, 2024, protest on Washington University's campus.

138.    By issuing the Wanted, Detective Barnhouse directly and unconstitutionally ordered for the arrest of Ms. Killgo. *See generally*, *Furlow v. Belmar*, 52 F.4th 393 (8th Cir. 2022).

139.    While Ms. Killgo was driving through Eureka, she was pulled over by Officer Kuelker for what she believed was a routine traffic stop.

140.    By Officer Kuelker's own admission, he arrested Ms. Killgo solely based on the REJIS Wanted entry.

141.    Ms. Killgo was subsequently arrested pursuant to the Wanted, and was held in Eureka Police Department's custody for approximately four hours.

142.    Mr. Killgo's arrest was unlawful as Officer Kuelker failed to generate independent probable cause, and was not operating as part of a search team with WUPD.

143.    Detective Barnhouse's conduct exceeded simply encouraging, promoting, or instigating Ms. Killgo's arrest—he directly issued the unlawful arrest order.

144.    As a direct and proximate result of Detective Barnhouse's conduct, Ms. Killgo was unlawfully arrested, suffering injuries and damages including but not limited to: fear, apprehension, depression, anxiety, consternation, and emotional distress.

145.    At all times relevant to the allegations of this complaint, Detective Barnhouse was employed by Washington University and was serving in its police department.

146.    Detective Barnhouse tortiously injured Ms. Killgo by unlawfully ordering her arrest.

147.    Detective Barnhouse ordered Ms. Killgo's arrest in hopes of furthering WUPD's investigation into the missing riot helmet.

148.    As such, Detective Barnhouse's tortious conduct was committed in furtherance of the interests of WUPD and Washington University.

149.    That is to say, Detective Barnhouse's tortious conduct was committed within the course and scope of his employment at Washington University.

150.    Under the doctrine of *respondeat superior*, Washington University is therefore vicariously liable for the injury-causing conduct of Detective Barnhouse committed within the course and scope of his employment at Washington University.

**WHEREFORE,** Ms. Killgo respectfully requests this Court issue a judgment against Detective Barnhouse for tortiously injuring Ms. Killgo by unlawfully ordering to have her arrested, and against Washington University which is vicariously liable for the torts of its employee. Ms. Killgo further requests the judgment compensate her for the damages she suffered as a result of the tortious injury, and for any other relief this Court deems just and proper.

<u>**COUNT IV**</u>
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – COGNIZABLE UNDER MISSOURI COMMON LAW**
**(Against Detective Barnhouse and Washington University)**

151.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

152.    After Ms. Killgo refused to be questioned by WUPD, Detective Barnhouse threatened to have her arrested.

153.    Ms. Killgo's ability to refuse questioning is rooted in her Fifth and Fourth Amendment rights.

154.    Ms. Killgo was properly exercising her constitutional rights both when she refused to be questioned without her counsel present while in Eureka custody, and by refusing to go to the WUPD station to make a voluntary statement.

155.    Detective Barnhouse threatened to have Ms. Killgo arrested again for her lawful refusal to be questioned.

156.    Detective Barnhouse threatening Ms. Killgo with arrest for lawfully exercising her constitutional rights is intolerable conduct which goes beyond the bounds of decency.

157.    As such, the threat constitutes extreme and outrageous conduct.

158.    In making this threat, Detective Barnhouse intended to intimidate, bully, and frighten Ms. Killgo into making a statement at the WUPD station.

159.    Thus, the sole intent in Detective Barnhouse's conduct was to gain compliance through causing Ms. Killgo emotional distress.

160.    Detective Barnhouse's threats resulted in harm to Ms. Killgo. She now feels deep anxiety, fear, and apprehension on a near daily basis given the continuing threat of an unlawful and unjustified arrest.

161.    As a direct and proximate result of Detective Barnhouse's conduct, Ms. Killgo has suffered injuries and damages including but not limited to: fear, apprehension, depression, anxiety, consternation, and emotional distress.

162.    At all times relevant to the allegations of this complaint, Detective Barnhouse was employed by Washington University, serving in its police department, and deputized under St. Louis County Revised Ordinance 701.070.10.

163.    Detective Barnhouse tortiously injured Ms. Killgo by threatening to order her arrest after she refused voluntary questioning.

164.    Detective Barnhouse threatened Ms. Killgo in hopes of forcing her to waive her constitutional rights.

165.    As such, Detective Barnhouse's tortious conduct was committed in furtherance of the interests of WUPD and Washington University.

166.    That is to say, Detective Barnhouse's tortious conduct was committed within the course and scope of his employment at Washington University.

167.    Under the doctrine of *respondeat superior*, Washington University is therefore vicariously liable for the injury-causing conduct of Detective Barnhouse committed within the course and scope of his employment at Washington University.

**WHEREFORE,** Ms. Killgo respectfully requests this Court issue a judgement against Detective Barnhouse for tortiously injuring Ms. Killgo by threatening to have her arrested for asserting her constitutional rights, and against Washington University which is vicariously liable for the torts of its employee. Ms. Killgo further requests the judgment compensate her for the damages she suffered as a result of the tortious injury, and for any other relief this Court deems just and proper.

### COUNT V
### *MONELL* CLAIM FOR UNCONSTITUTIONAL CUSTOM AND PRACTICE OF USING WANTEDS SYSTEM IN VIOLATION OF THE FOURTH AMENDMENT
**(Against Washington University and St. Louis County)**

168.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

169.    Rather than obtaining a judicial determination of probable cause before arresting Ms. Killgo, Detective Barnhouse issued a Wanted for Ms. Killgo and/or her vehicle.

170.    This unconstitutional action was done pursuant to custom and practice of Washington University and/or St. Louis County Police Department.

171.    Washington University is subject to *Monell* liability even if WUPD is a private entity whose employees are not law enforcement officers—as Washington University claims.

172.    "The Supreme Court has recognized a number of circumstances in which a private party may be characterized as a [governmental] actor, including where a private actor is a willful participant in joint activity with the governmental entity or its agents." *Meier v. St. Louis, Missouri, City of*, 934 F.3d 824, 829 (8th Cir. 2019) (citing *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)).

173.    Regardless of WUPD's true nature, it holds itself out to the public as a legitimate police department, its officers routinely arrest Missouri residents, and it can access REJIS to issue Wanteds which trigger action from police officers across the state.

174.    WUPD has a uniquely close connection with St. Louis County Police Department. WUPD arrestees are detained in the county jail, and WUPD is subject to ongoing operational review by the St. Louis County Police Department as per its Deputation Agreement with St. Louis County Police Department.

175.    Therefore, WUPD was acting in a close nexus with St. Louis County Police Department and under color of law when it ordered the arrest of Ms. Killgo via the Wanteds System.

176.    Washington University is culpable for WUPD's unconstitutional custom of enforcing of the Wanteds System pursuant to *Monell v. New York Department of Social Services.* 436 U.S. 658 (1978), and its progeny.

177.    Alternatively, if Detective Barnhouse was acting as a deputized St. Louis County Officer, then St. Louis County is culpable pursuant to *Monell.*

178.    St. Louis County Police have faced over a decade of litigation over its unconstitutional abuses of the Wanteds System.

179.    St. Louis County and Washington University Police Department were aware of the constitutional problems with the Wanteds system upon the issuance of the United States Department of Justice Civil Rights Division's March 4, 2015 report titled Investigation of the Ferguson Police Department. In that report, the United States Department of Justice wrote: "[W]hile wanteds are supposed to be based on probable cause, see FPD General Order 424.01, they operate as an end-run around the judicial system." *Id.* at 22. "Instead of swearing out a warrant and seeking judicial authorization from a neutral and detached magistrate, officers make the probable cause determination themselves and circumvent the courts." *Id.* The report cites various officers from Ferguson, in a manner typical of St. Louis County departments, describing how a Wanted is issued to effectuate an arrest to *allow the officer to investigate* rather than because there is probable cause: "e gave the example of investigating a car theft. Upon identifying a suspect, he would put that suspect into the system as wanted "because we do not have probable cause that he stole the vehicle." *Id.* at 23.

180.    Likewise, the *Furlow v. Belmar* litigation revealed that St. Louis County has employed a custom of issuing Wanteds which cause other police officers from St. Louis County or police officers from outside municipalities to arrest the target of the Wanted following routine traffic stops unrelated to the allegations of the Wanted. These arrests are made without obtaining a prompt determination of probable cause by a neutral judicial magistrate in violation of the Fourth and Fourteenth Amendments.

181.    In *Furlow v. Belmar*, the designees of St. Louis County testified that for decades it has been department policy and practice to issue Wanteds not because the officer developed probable cause to allow for arrest, but for the express purpose of getting a person into custodial interrogation to allow officers to *complete* their investigations before going to get a warrant—

testimony that was echoed by every single deposed officer in that litigation. See *Furlow v. Belmar*, 4:16-cv-00254-JAR (E.D. Mo. Oct. 6, 2017), Doc. 101 at 25-28.

182.    Data produced by REJIS, the third party company that allows officers to actually issue the Wanteds, demonstrates that Wanteds are staggeringly common: over 15,000 Wanteds issued between 2011 and 2016, and then rough 6,500 issued between 2018 and 2023.

183.    For example, in a review of hundreds of examples of Wanteds entries and arrests by St. Louis County officers produced in discovery in the *Furlow v. Belmar* case between 2020 and 2023, the narratives from police officers from St. Louis County regularly issued Wanteds that suffered constitutional defects, including: :

   a. Issuing Wanteds when there is not enough information to constitute probable cause;
   b. issuing Wanteds to punish a suspect for not wanting to give a voluntary interview or asking to speak to a lawyer;
   c. issuing Wanteds when there is no exigent circumstance or reason that a warrant would be impractical to obtain, and often simply for the issuing officer's convenience; and
   d. ordering arrests on Wanteds to be effectuated by officers who have no independent basis to suspect that person of a crime.

184.    Policymakers from St. Louis County were aware of these practices and, given the *Furlow v. Belmar* litigation and opinion, aware that St. Louis County police officers used the Wanteds system in ways that were unconstitional.

185.    Yet those same policymakers took insufficient remedial actions. Despite the language in *Furlow v. Belmar* instructing that officers are not to issue Wanteds unless there was an otherwise applicable exception to the warrant requirement, St. Louis County officers routinely continue to issue Wanteds for non-exigent circumstances, in order to get someone who otherwise does not wish to make a statement into custodial interrogation, and in order to *complete* investigations.

186.     The above-described actions of Detective Barnhouse are consistent with St. Louis County's routine custom regarding Wanteds.

187.     At all relevant times, Detective Barnhouse was acting pursuant to this custom, which is so pervasive as to constitute the policy of WUPD and St. Louis County.

188.     As such, Defendant St. Louis County is culpable for Detective Barnhouse's and WUPD's unconstitutional custom of enforcing of the Wanteds System pursuant to *Monell v. New York Department of Social Services.* 436 U.S. 658 (1978), and its progeny.

189.     Furthermore, St. Louis County was deliberately indifferent in their duties to correct, supervise, control, and discipline WUPD officers when such violations occurred.

190.     St. Louis County has the power and responsibility to prevent the unconstitutional custom of enforcing the Wanteds System but has failed to do so.

191.     As a direct and proximate result of WUPD and St. Louis County's custom of enforcing the Wanteds System, Ms. Killgo has suffered injuries and damages including but not limited to: being unlawfully seized and deprived of her freedom, being detained in custody, fear, apprehension, depression, anxiety, consternation and emotional distress; and violation of her constitutional rights.

192.     The actions of WUPD and St. Louis County described herein were intentional, wanton, malicious, and/or were callously indifferent to the rights of Plaintiff, thus entitling Plaintiff to an award of punitive damages against Washington University and St. Louis County

193.     If Plaintiff prevails, she is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**WHEREFORE,** Ms. Killgo respectfully requests this Court issue a judgment against Washington University and St. Louis County for violating her Fourth and Fourteenth

Amendment rights through their custom of effecting warrantless arrests unsupported by probable cause and outside any exception to the warrant requirement. Ms. Killgo further requests the judgment compensate her for the damages she suffered as a result of the unconstitutional custom, and for any other relief this Court deems just and proper.

## COUNT VII
## CONSPIRACY TO DEPRIVE CIVIL RIGHTS – COGNIZABLE UNDER 42 U.S.C. § 1983
## (Against Defendant Barnhouse, Defendant Kuelker, Washington University, St. Louis County)

194.   Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

195.   Ms. Killgo was deprived of her constitution right to be free from unlawful seizures when she was arrested on a Wanted in September of 2024.

196.   This deprivation of her civil rights was the result of a conspiracy between Defendant Barnhouse, Defendant Kuelker, WUPD, and St. Louis County.

197.   "[W]hen a civil conspiracy claim involves both state and private actors, the private party can be liable for conspiring with state officials if he was a willful participant in the conspiracy." *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 845 (D. Minn. 2021) (citing *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008); *Dossett v. First State Bank*, 399 F.3d 940, 951 (8th Cir. 2005); *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993)).

198.   St. Louis County and WUPD were members of the conspiracy because either one or both entities allowed Defendant Barnhouse, a private employee of Washington University of St. Louis Police Department, access and ability through the REJIS software to send out arrest orders to any officer in the state of Missouri without meaningful restrictions on his ability to do so constitutionally.

199.    As described above, Defendant Barnhouse initiated a plan to unlawfully arrest and detain Ms. Killgo by issuing an unconstitutional Wanted.

200.    Defendant Kuelker joined the conspiracy when he took Ms. Killgo into custody based only on a REJIS entry with no independent generation of probable cause.

201.    In furtherance of the conspiracy, the Defendants committed the following overt acts:

a.    Issuing an unlawful "Wanted for Questioning" on Ms. Killgo, effectively ordering her arrest without first obtaining a warrant and with no attempt or ability to confer probable cause onto the arresting officer.
b.    Facilitating the warrantless arrest and detention of Ms. Killgo by communicating with Eureka police department.
c.    Threatening to again arrest Ms. Killgo for exercising her constitutional rights to be free from a custodial interrogation without counsel, and to "walk away" from police questioning.

202.    Each of The Defendant's overt acts in furtherance of the conspiracy violated Ms. Killgo's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments.

203.    As a direct and proximate result of Detective Barnhouse's overt acts, Ms. Killgo has suffered injuries and damage including but not limited to: fear, apprehension, depression, anxiety, consternation, and emotional distress.

204.    The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Ms. Killgo, thus entitling her to an award of punitive damages against Detective Barnhouse, Officer Kuelker, Washington University and St. Louis County.

205.    If Plaintiff prevails she is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**WHEREFORE,** Ms. Killgo respectfully requests this Court issue a judgment against Defendant Barnhouse, Defendant Kuelker, Washington University, St. Louis County for engaging in a conspiracy to deprive Ms. Killgo of her civil rights. Ms. Killgo further requests the

judgment compensate her for the damages she suffered as a result of the unconstitutional

conspiracy, and for any other relief this Court deems just and proper.

**Dated**: September 17, 2025                 Respectfully submitted,

                                             **ARCHCITY DEFENDERS, INC.**
                                             */s/ Ebony A. McKeever*
                                             Maureen Hanlon, #70990MO
                                             Ebony McKeever, #77050MO
                                             440 N. 4th Street, Suite 390
                                             Saint Louis, MO 63102
                                             (314) 361-8834
                                             314-925-1307 (fax)
                                             mhanlon@archcitydefenders.org
                                             emckeever@archcitydefenders.org

                                             *Attorneys for the Plaintiff*